COURT OF APPEALS


EIGHTH DISTRICT OF TEXAS


EL PASO, TEXAS



)
 

CESAR LARA,
)
 No. 08-02-00243-CR

)


 Appellant,
)
 Appeal from

)
 

v.
)
 384th District Court

)


THE STATE OF TEXAS,
)
 of El Paso County, Texas

)


 Appellee.
)
 (TC# 20020D00227)


O P I N I O N



 Cesar Lara was charged with the murder of Robert Alba which occurred on November 2,
1995. Appellant's whereabouts were unknown until March 26, 2001. A jury found him guilty of
second degree murder and assessed punishment at twenty years in the Institutional Division of the
Texas Department of Criminal Justice and a fine of $5,000. On appeal, he challenges the sufficiency
of the evidence. We affirm.

FACTUAL SUMMARY


 Due to the sufficiency challenge, we shall endeavor to provide a detailed factual background. 
In November 1995, Robert "Bobby" Alba worked as a door man at a downtown El Paso gay bar
known as the Old Plantation or the "OP." Appellant worked at the Cliff Bar, also a gay bar, which
was right around the corner. Since Appellant usually rode his bike to work, he often noticed Alba
working the door when he rode by the OP, but they had never met.

 Francisco Mendoza was a bartender at the Briar Patch, another downtown gay bar. He saw
both Alba and Appellant in the Briar Patch on the night of November 1, 1995. Alba usually came
into the bar every Wednesday night for a pool tournament. Mendoza testified that Appellant was
looking for someone to take home with him. He solicited Mendoza, who told Appellant that he had
a boyfriend. Mendoza spoke with Alba throughout the evening and Alba eventually expressed an
interest in Appellant. Mendoza saw the two of them talking around 1 a.m. Appellant was still in
the bar around 2 a.m., but he went outside before the bar quit serving. Alba remained in the bar until
he was finally asked to leave around 2:15 a.m. At trial, Mendoza identified Appellant from a photo
lineup. He also identified Appellant as Alba's companion in a security videotape recorded at a
westside Denny's Restaurant later that evening. Mendoza testified that Appellant was wearing the
same clothes in the video that he had worn to the Briar Patch that night.

 Michael Newark worked with Alba at the OP. He was at Denny's in the early morning hours
of November 2 and saw Alba arrive sometime between 4:30 a.m. and 5 a.m. Alba was accompanied
by another man whom he did not recognize. Newark was able to give a physical description of the
other man's appearance and clothing. Alba and his companion ordered take out food and were only
in the restaurant for about twenty minutes, leaving sometime between 5 a.m. and 5:30 a.m. Newark
saw them drive away together in Alba's red Fierro. Although Newark was unable to recognize
Alba's companion from a photo lineup, he identified Appellant at trial.

 Katherine Dirriel worked as a bartender at the U Got It Club. She testified that on
November 2, she got off work at around 2:30 or 2:45 a.m. and drove a co-worker home. Her co-worker was a roommate of Alba's next door neighbor. While Dirriel was stopped at the corner of
Rio Grande and Oregon, she saw Alba pull up to the intersection in his red Fierro. She saw a second
car directly behind Alba, following so closely the cars were almost bumper to bumper. She did not
recognize the car or the person driving, but she described the driver as an Hispanic male in his late
twenties or early thirties, with straight black hair to his shoulders and wearing a baseball cap. 

 Melissa Nicholson-Messer lived next door to Alba at the Diplomat Apartments and worked
with him at the OP. During the early morning hours of November 2, she arrived home after a late
night of partying around 1 a.m. and went to sleep around 2:30 or 3 a.m. She awoke around 6 a.m.
after hearing loud noises coming from Alba's apartment. She described the noise as a loud thump
which sounded like it came from Alba's living room. She heard several more thumps and after each
one, she heard a moan. Thinking Alba was involved in sexual relations, she turned on the radio to
block out the noise and went back to sleep. She did not notice anything unusual when she left her
apartment around 10 a.m. the next morning. When she returned home around 11:30 a.m., she
noticed the police at Alba's apartment. She told the officers about the noises she had heard and that
when she left her apartment that morning, she thought Alba's curtains were closed. She was unable
to recall whether his front door was closed. Alba had only lived next door to her for about four
months; Rudy Ortiz was his roommate at the time. 

 Rodolfo "Rudy" Ortiz also worked at the Briar Patch. He had lived with Alba in the two
bedroom apartment for about a month or two prior to the murder. Ortiz and his partner, Manuel
Flores, left for Flores's home in Chaparral, New Mexico on the morning of Tuesday, October 31. 
Ortiz returned to the apartment around 1 p.m. the next day to pick up a change of clothes and pay
the rent, but he did not see Alba. Ortiz then went back to Chaparral and spent Tuesday and
Wednesday nights at Flores's parents' home.

 Ortiz and Flores went back to the apartment around 11:45 a.m. on November 2, so that Ortiz
could change clothes before going to work. As they approached, they noticed that the front door was
slightly open. Ortiz suggested to Flores that he not go inside since Alba had been upset that Flores
and Ortiz were spending so much time together. Ortiz was surprised the door was open because
Alba usually worked at night and slept during the day. Ortiz looked inside and saw Alba lying on
the floor in a pool of blood. Realizing Alba was dead, Ortiz ran screaming towards Flores. The two
of them looked around the apartment to see whether anyone else was present, but they tried not to
disturb anything. They covered the body with a blanket.

 Manuel Flores testified that he knew Alba because he frequented the OP. On occasion, he
would go over to Alba's apartment with Ortiz after the bar closed. Ortiz was his partner at the time. 
His statements concerning his activities and whereabouts in the days before the murder tracked
Ortiz's story. Flores confirmed that he went to the apartment on November 2 around 11:30 a.m. so
Ortiz could get dressed for work. As they approached the apartment, they noticed that the front door
was ajar and Flores decided to return to the car. He heard Ortiz scream and saw him run out of the
apartment. When he entered the apartment with Ortiz, Alba was lying on the floor in a pool of
blood. After realizing that Alba was dead, they called the police. They approached the body, but
he could not remember if they ever stepped in the blood around the body. Flores told the police that
he saw a broken chair on its side near the body. 

 Donald Marron of the El Paso Fire Department testified that he and two other firemen were
dispatched to the Diplomat Apartments on November 2, 1995 around 11:30 a.m. When they arrived,
a man was standing in the doorway of Alba's apartment. Marron would not allow anyone to go
inside except to assess the victim. They found Alba lying on the floor in a pool of blood. Believing
foul play was involved, Marron immediately called the police. Sergeant Raymond Chaires of the
El Paso Police Department was the first officer on the scene. He secured the area and ensured no
one entered the apartment. 

 Thomas Garcia was an El Paso police officer assigned to the criminalistics division. It was
his task to collect evidence from the crime scene and document it. Garcia collected some finger
nails, pubic hair, and scalp hair samples from the deceased. Garcia also attended the autopsy on
November 3 and collected two vials of blood.

 Stephen Martinez was a police officer in the latent fingerprints division. Bloody footprints
were found around the body. Blood was also found on the chair near the body. He took photographs
and dusted for fingerprints. Fingerprints were lifted from a Budweiser beer can and a glass. 
Martinez also took hair samples and blood samples from Ortiz. 

 Joe Hernandez was an officer with the El Paso Police Department who worked in the
criminalistics unit. He took fingerprints and hair samples from Alba's car. He collected hair
samples found in the bathroom and in Alba's bedroom. He collected items on a table next to Alba's
bed, including cigarette butts in the ashtray, a used condom, and a Budweiser beer can. And he
collected blood samples which were found around the body. He lifted three bloody shoe prints from
the floor next to Alba's body. 

 Guillermo Martinez was a detective with the El Paso Police Department. He went to
Denny's to investigate because he had information that Alba had been there prior to his death. 
Martinez obtained the surveillance video from the store's manager. 

 Christine Ceniceros was a criminalist employed in the DNA section of the Texas Department
of Public Safety. She was accepted as a DNA expert by the court. She and Vanessa Nelson, also
a DNA analyst, analyzed the blood samples of Appellant, Alba, and Ortiz. Ceniceros also analyzed
the cigarette butts that were found at the crime scene. The DNA profile on several of the butts was
consistent with Appellant's DNA profile. She was only able to detect the DNA of Alba on the used
condom. Ortiz's hair was tested and compared with that found in the bathroom and in Alba's bed. 
Appellant's hair was never tested. 

 Bruce Orndorf was a senior latent fingerprint expert for the El Paso Police Department. He
was accepted as an expert fingerprint analyst by the trial court. He took fingerprints of Ortiz and
Alba. He explained that it would be difficult to take prints from the chair because it had porous
surface that basically absorbed the prints. He unsuccessfully attempted to take prints from Alba's
body. Shoe prints and footprints were not compared. 

 Appellant's fingerprints were not obtained until he was arrested in March 2001. His
fingerprints matched those found on Alba's car and on the Budweiser can. Ortiz's print was also
lifted from the Budweiser can. 

 Dr. Juan Contin was the medical examiner for El Paso County who conducted the autopsy. 
Alba had lacerations to the head, bruising to the right hand, and bruises to the facial area caused by
blunt force blow to the head. Buccal and rectal smears were taken to determine the presence of
semen but both test results were negative. Alba had a blood alcohol level of 0.069. A considerable
amount of food was found in Alba's stomach and Dr. Contin surmised that he had eaten less than
two hours before he died. Dr. Contin determined that the cause of death was asphyxia due to
compression of the neck. There were no fingerprints around the neck area. He determined that
Alba's injuries were consistent with his being strangled by an arm or by placing an object over his
neck, such as a chair. 

 Rosa Ramirez was the mother of Ruth Ramirez, Appellant's common-law wife. Appellant
lived with Ruth at her mother's house and had a sexual relationship with Ruth which produced a
child. On November 3, 1995, Rosa was celebrating her birthday at home. Detectives came to her
house looking for Appellant but he was not there. A few days later, Rosa and Ruth went to Juarez,
Mexico to see Appellant. Rosa asked Appellant why the police were looking for him and asking
questions. Appellant told Rosa that a man was going to take him to his apartment because he was
going to give him something to eat. The man was supposed to give Appellant a ride home
afterwards. When the man later tried to hug and kiss him, Appellant became angry, grabbed the man
around the neck until he fell to the ground, and then hit him with a chair. Appellant told Rosa that
he put his arm around the man's neck in a forceful manner so as to choke him. Appellant never
described the man or provided a name to her. Rosa described Appellant as laughing while he told
the story. Rosa did not give a statement to the police until March 2001 because of her daughter and
granddaughter. 

 Ruth Ramirez testified on behalf of Appellant and acknowledged she was his wife. She
denied having a conversation with her mother and Appellant in Juarez in which he discussed details
of the incident. She admitted they went to Juarez a few days after the murder, but said that she never
saw or spoke with Appellant. She told the police that she had not seen Appellant since he was
indicted on November 7, 1995. On cross-examination, Ruth admitted that she tried to keep her
mother from testifying because "[s]he gets sick when she's under a lot of pressure." Ruth testified
that she would not lie for Appellant.

 Several attempts were made to locate Appellant between 1995 and 2001. Officers knew that
Appellant had family in Juarez and believed he had crossed the border. An arrest warrant was issued
in March 2001 soon after Rosa gave her statement to the police. Appellant was picked up the next
day near the El Paso airport. 

 Arturo Perez was a detective with the El Paso Police Department. On March 26, 2001, he
interviewed Appellant and took his statement. We quote here excerpts of the statement:

 When I was 15 years old, I met and moved in with a girlfriend named Nora Hilda
Morales. We lived about 5 years together and had three children. I then met another
girl by the name of Ruth Ramirez who I dated off and on and had a little girl.


. . .



 About 4 or 5 years back, I used to work at the Cliff bar located on Paisano Street. 
The bar is a gay bar. It's right around the corner from the OP, another gay bar. Back
then, I was living on Yandell street and I would take my bike to work. On my way
to work, I would pass by the OP. Every time I would pass by the OP, the door was
open and I would see an old man working at the door collecting the money. Since
I used to hang around the Sunset area, one day I saw the door man from the OP
driving up to an apartment on Yandell Street. I did not speak with him I just thought
that is where he lived.

 

 One night about 6 years ago, I can't remember if it was on a Friday or Saturday at
about 12 or 1 am, I was going home from the Sunset area when I passed by a gay bar
that is on Rio Grande and Mesa. I noticed a lot of people leaving as they were
closing. I saw the doorman from the OP come out and I noticed he was drunk. I
asked him if he could lend me five dollars and that I would pay him back. The man
recognized me from where I worked as he used to go to the Cliff's bar. He told me
he was on his way to eat and asked if I wanted to go with him. I told him yes so I
locked my bike to a pole and got into his red Fierro that was parked across the street
from the bar. He drove up Mesa and went to the Denny's. We walked inside the
Denny's and he ordered food to go for both of us. I picked up the food and we got
back into his car. He drove down Mesa and I told him to stop at the corner and he
stopped at a gas station and I got off. I got my food and ate it on the way to pick up
my bike. I then got my bike and went home. About two months after this night, I
was told by friends that I was being accused of killing the man from the OP. I never
hurt the man; the last time I saw him was that night. I never knew his name, I just
knew he worked at the OP.


Appellant denied ever being in Alba's apartment. 

 Detective Perez testified the officers had gone to the apartment on November 2, 1995, to
investigate the crime scene. They knew that Ortiz and Flores had gone into the apartment after
finding Alba's body. The outlines of their footprints were checked to see if either one matched the
bloody footprints next to the body. Neither of the prints matched. Flores and Ortiz were eliminated
as suspects after the police department developed information that Appellant was seen with Alba at
the Briar Patch Bar and later at Denny's. The officers also had the security video from Denny's
which depicted Appellant with Alba, wearing the same clothes which he had worn to the bar earlier
that night. Appellant was further identified as the primary suspect after latent prints were found on
the Budweiser can discovered in Alba's bedroom and also on the passenger side door in Alba's red
Fierro. Perez admitted that they never went to Chaparral to question Flores's parents and that they
never interviewed Alba's former roommate. He also admitted that they did not take any
measurements of the bloody shoe prints but just looked to see if blood was present on the bottom of
the shoes worn by either Ortiz or Flores. 

SUFFICIENCY OF THE EVIDENCE


 In Points of Error One and Two, Appellant challenges the legal and factual sufficiency of the
evidence to support the conviction against him for the offense of murder. In reviewing the legal
sufficiency of the evidence to support a criminal conviction, we must review all the evidence, both
State and defense, in the light most favorable to the verdict to determine whether any rational trier
of fact could have found the essential elements of the offense beyond a reasonable doubt. Jackson
v. Virginia, 443 U.S. 307, 318-19, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560, 573 (1979); Geesa v. State,
820 S.W.2d 154, 159 (Tex.Crim.App. 1991). We must evaluate all of the evidence in the record,
whether admissible or inadmissible. Wilson v. State, 7 S.W.3d 136, 141 (Tex.Crim.App. 1999);
Johnson v. State, 967 S.W.2d 410, 412 (Tex.Crim.App. 1998). We do not resolve any conflict of
fact or assign credibility to the witnesses, as it was the function of the trier of fact to do so. See
Adelman v. State, 828 S.W.2d 418, 421 (Tex.Crim.App. 1992); Matson v. State, 819 S.W.2d 839,
843 (Tex.Crim.App. 1991). Instead, our duty is only to determine if both the explicit and implicit
findings of the trier of fact are rational by viewing all of the evidence admitted at trial in a light most
favorable to the verdict. Adelman, 828 S.W.2d at 422. Any inconsistencies in the evidence are
resolved in favor of the verdict. Matson, 819 S.W.2d at 843. The standard of review is the same for
both direct evidence and circumstantial evidence cases. Geesa, 820 S.W.2d at 158.

 When conducting a factual sufficiency review, we consider all of the evidence, both
admissible and inadmissible, but we do not view it in the light most favorable to the verdict. Clewis
v. State, 922 S.W.2d 126, 129 (Tex.Crim.App. 1996); Levario v. State, 964 S.W.2d 290, 295
(Tex.App.--El Paso 1997, no pet.). We review the evidence weighed by the jury that tends to prove
the existence of the elemental fact in dispute and compare it with the evidence that tends to disprove
that fact. Johnson v. State, 23 S.W.3d 1, 7 (Tex.Crim.App. 2000); Jones v. State, 944 S.W.2d 642,
647 (Tex.Crim.App. 1996), cert. denied, 522 U.S. 832, 118 S.Ct. 100, 139 L.Ed.2d 54 (1997). A
defendant challenging the factual sufficiency of the evidence may allege that the evidence is so weak
as to be clearly wrong and manifestly unjust, or in a case where the defendant has offered contrary
evidence, he may argue that the finding of guilt is against the great weight and preponderance of the
evidence. See Johnson, 23 S.W.3d at 11. Although we are authorized to set aside the fact finder's
determination under either of these two circumstances, our review must employ appropriate
deference and should not intrude upon the fact finder's role as the sole judge of the weight and
credibility given to any evidence presented at trial. See Johnson, 23 S.W.3d at 7. We are not free
to reweigh the evidence and set aside a verdict merely because we feel that a different result is more
reasonable. Cain v. State, 958 S.W.2d 404, 407 (Tex.Crim.App. 1997); Clewis, 922 S.W.2d at 135.

Elements of Murder


 A person commits the offense of murder if he intentionally or knowingly causes the death
of an individual, or intends to cause serious bodily injury and commits an act clearly dangerous to
human life that causes the death of an individual. Tex.Pen.Code Ann. § 19.02 (b)(Vernon 2003).
Murder in the first degree may be reduced if the person commits murder in sudden passion, that is,
the murder was directly caused by and arising from provocation by the individual killed. 
Tex.Pen.Code Ann. § 19.02 (a). If, as here, the defendant proves the issue by a preponderance of
the evidence, the offense is a felony of the second degree. Tex.Pen.Code Ann. § 19.02 (c)(d).

The Evidence


 Police initially had several suspects but finally focused on Appellant. Mendoza had spoken
with both Alba and Appellant at the Briar Patch bar and later saw them talking together. Dirriel saw
a car that appeared to be following closely behind Alba's Fierro, just a block or two from his
apartment between 2:30 or 2:45 a.m. Newark saw Alba at Denny's with another man--which the
videotape suggests was Appellant--between 4:30 a.m. and 5 a.m. Melissa Nicholson-Messer heard
thumping sounds and moans during the early morning hours coming from Alba's living room. The
medical examiner reported that Alba had lacerations to the head, bruising to the right hand, and
bruises to the facial area caused by a blow to the head by a blunt object. The bone covering the
larynx and the hyoid bone in Alba's neck were both fractured. The cause of death was asphyxia due
to compression of the neck. Because there were no fingerprints around the neck area, the coroner
concluded that Alba had been manually strangled by an arm or some other object applied to the neck,
such as a chair.

 The police found Appellant's fingerprints in Alba's car and on the Budweiser can found in
Alba's apartment. DNA samples taken from the cigarette butts in the apartment matched Appellant's
profile. The day after Alba's body was found, police detectives went to the home of Rosa Ramirez
to determine Appellant's location, but she provided no useful information. Officers believed
Appellant fled to Mexico within days of the murder. It was not until Rosa Ramirez implicated
Appellant in March 2001 that the arrest warrant was issued.

 Appellant argues that there was no direct evidence connecting him to the murder. He
contends that while his fingerprints were found in Alba's car, this only proves he was a passenger. 
Although his thumb print was found on a Budweiser can in Alba's bedroom, Ortiz's thumb print was
found on the same can. The fact that his DNA was found on a cigarette butt in Alba's bedroom,
shows only that he was in the apartment. In short, he claims that all of the evidence proves only that
he was with Alba on the night he was killed--which he admitted in his statements to police--but does
not prove that he killed Alba.

 We believe the evidence suggests far more. Appellant admitted to leaving the bar with Alba
on the night of the murder. He admitted going with Alba to Denny's. Significantly, he told officers
that Alba dropped him off on Mesa Street; he specifically denied ever going to Alba's apartment. 
Yet DNA test results on the cigarette butts confirmed that Appellant had in fact been in the
apartment. His fingerprints were also on the beer can in Alba's bedroom.

 Moreover, evidence of flight and guilty demeanor, coupled with other corroborating
circumstances, may also tend to connect a defendant with the crime. Burks v. State, 876 S.W.2d 877,
888 (Tex.Crim.App. 1994), cert. denied, 513 U.S. 1114, 115 S.Ct. 909, 130 L.Ed.2d 791 (1995); see
also Passmore v. State, 617 S.W.2d 682, 685 (Tex.Crim.App. 1981). We conclude there is ample
evidence to support the conviction. We reject Appellant's sufficiency complaints, overrule Points
of Error One and Two, and affirm the judgment of the trial court. 



October 23, 2003 

 ANN CRAWFORD McCLURE, Justice


Before Panel No. 1

Larsen, McClure, and Chew, JJ.


(Do Not Publish)